# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

THOMAS W. MCNAMARA, )
               Plaintiff, )  Case No.: 2:17-cv-02967-GMN-BNW
  vs. )
                )  **ORDER**
LINDA HALLINAN, *et al.*, )
               Defendants. )

Pending before the Court is the Motion to Dismiss, (ECF No. 29), filed by Defendants Carolyn Hallinan and Linda Hallinan (collectively "Defendants"). Plaintiff Thomas W. McNamara ("McNamara") filed a Response, (ECF No. 33), and Defendants filed a Reply, (ECF No. 36).

Also pending before the Court is Defendants' Motion to Stay Proceedings, (ECF No. 98). For the reasons discussed herein, Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part**. Furthermore, Defendants Motion to Stay is **DENIED as moot**.

## I. BACKGROUND

This case arises from McNamara's exercise of authority as court-appointed monitor ("Monitor") over the judgment debtor's assets in *Fed. Trade Comm'n. v. AMG Servs., Inc.*, 2:12-cv-00536-GMN-VCF ("*FTC v. AMG*"). In *FTC v. AMG*, the Court granted summary judgment in favor of the Federal Trade Commission ("FTC") and against defendant Scott Tucker ("Tucker") and his businesses for a payday lending scheme in violation of the FTC Act, 15 U.S.C. § 45(a)(1). *See FTC v. AMG*, No. 2:12-cv-00536-GMN-VCF, 2016 WL 5791416 (D. Nev. Sept. 30, 2016), *aff'd sub nom. Fed. Trade Comm'n v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018).

The FTC initially brought its action against Tucker and his entities in 2012, alleging that Tucker orchestrated a massive payday lending enterprise engaging in criminal and deceptive practices. Their Complaint brought claims for violations of § 5(a) of the FTC Act, the Truth in Lending Act, and the Electronic Funds Transfer Act. The FTC also named as defendants ten entities, including three of Tucker's loan servicing companies (one of which was NM Service Corp. ("NMS")), three Indian tribes, and four corporate lending companies, all allegedly under Tucker's control in furtherance of his scheme. (*See* Am. Compl. ¶ 24, ECF No. 20).

Relevant here, the Court found that the FTC's evidence established that Tucker, through his loan servicing companies, including NMS, directed the creation of sham lending corporations, also under Tucker's control. *FTC v. AMG*, 2016 WL 5791416, at *6–7. The Court also concluded that the FTC put forth "overwhelming evidence" demonstrating that Tucker and his lending companies operated a common enterprise, for which they are jointly and severally liable for one another's wrongful conduct. *Id.* at *9.

The Court granted FTC its requested injunctive relief, enjoining Tucker from assisting "any consumer in receiving or applying for any loan or other extension of Consumer Credit." *Id.* at *14. The Court also ordered that Tucker and his entities pay approximately $1.27 billion in equitable monetary relief to the FTC, based on consumer losses between 2008 and 2012. *Id.* at *12.

The parties subsequently negotiated a stipulated proposed order to resolve post-judgment matters including, *inter alia*, a stay of execution, asset freeze pending appeal, and the appointment of a monitor to oversee the freeze and preserve assets to support the Court's monetary judgment, (ECF No. 195). The Court granted the parties' stipulated order (the "Appointment Order"), and appointed McNamara as Monitor, authorizing him to preserve and recover assets on behalf of the Monitorship Estate. (*See* Appointment Order § VII.R, Ex. A to Am. Compl., ECF No. 20-1). The Appointment Order defines the Monitorship Estate as "[a]ll

of Scott Tucker's . . . and the Monitor Entities' Assets, wherever they may be located, in whosoever possession they may be found, whether owned directly or indirectly." (*Id.* § VI). Monitor Entities are defined as several corporate defendants and entities formerly controlled by Tucker, as well as their successors, assigns, affiliates, subsidiaries. (*Id.* Definitions § H). Assets, in turn, encompass "any legal or equitable interest in, right to, claim to, any real, personal, or intellectual property wherever located . . . " (*Id.* Definitions § A).

Under the Appointment Order, McNamara is vested with authority to, among other things, "[c]onduct such investigation and discovery . . . as may be necessary to locate and account for additional Assets (including Assets held by either Persons or entities other than a Defendant) belonging to, or held by others for the benefit of, any Defendant or Monitorship Entity, for inclusion in the Monitorship Estate." (*Id.* § VIII.G). McNamara is also directed and authorized to initiate or become a party to "proceedings in state, federal or foreign courts that the Monitor deems necessary and advisable to preserve or recover the Monitorship Estate or to carry out the Monitor's mandate under this order." (*Id.* § VIII.R). Pursuant to this authority, McNamara filed a series of suits, including the instant one, to claw back allegedly fraudulent transfers on behalf of the Monitorship Estate.

Prior to McNamara's appointment, Tucker exercised complete and exclusive control over the common payday lending enterprise, including, but not limited to, the Monitor Entities, all related entities, and all assets of the Monitorship Estate. (Am. Compl. ¶ 34). During the period of his control, Tucker, through his various entities, never took any action to address or mitigate the harms caused by his common enterprise, instead electing to conceal his ill-gotten gains. (*Id.* ¶ 35). According to McNamara, Tucker's efforts to transfer assets were only uncovered and rendered legally actionable upon his appointment as Monitor. (*Id.*).

In February 2016, during the pendency of the FTC's civil suit against Tucker and his affiliated entities, Tucker was indicted on fourteen felony counts in the Southern District of

New York arising from his payday lending operation. (*Id.* ¶¶ 37–38). On October 13, 2017, Tucker was convicted on all fourteen counts as charged and was subsequently sentenced to serve 200 months in prison. (*Id.* ¶ 39). In March 2016, Charles Hallinan ("Hallinan"), Tucker's co-conspirator and owner of one half of the profits and assets of NMS, was indicted on seventeen counts in connection with his related payday lending enterprise. (*Id.* ¶ 40). Based upon evidence gathered in Tucker's indictment, Hallinan was alleged to have participated with Tucker in a conspiracy to collect unlawful debts, make usurious loans, and shield these activities from regulators by engaging in sham transactions. (*Id.* ¶¶ 41–42). Hallinan was convicted on all seventeen counts in the Eastern District of Pennsylvania on November 27, 2017. (*Id.* ¶ 43).

In the present case, McNamara alleges that Defendants—the adult daughters of Hallinan, Tucker's co-conspirator—received hundreds of thousands of dollars from Monitor Entities in the form of purported "interest payments" on a loan. (Am. Compl. ¶¶ 4–5, ECF No. 20). In July 2002, Defendants supposedly made a $500,000 loan to C.B. Service Corp.—an entity controlled by Tucker, owned by Monitor Entity NMS, and allegedly established as a sham to conceal Tucker and Hallinan's identity and minimize risk of legal exposure. (*Id.* ¶¶ 13, 67–68). The loan carried an interest rate of 24 percent per annum, based upon which, C.B. Service Corp. sent Defendants monthly payments between 2003 and 2008, totaling $630,000. (*Id.* ¶¶ 14–17).

According to McNamara, the loan was a mechanism designed to deprive NMS and related Tucker-controlled entities of their money by diverting the assets to Defendants, the family of Tucker's close business partner and co-conspirator. (*Id.* ¶ 15). McNamara contends there was no legitimate purpose behind these payments; rather they were intended to "hinder, delay, or defraud the Monitor Entities," in contravention of their interests and against their will. (*Id.* ¶ 18).

McNamara filed the instant action to claw back these allegedly fraudulent transfers on behalf of the Monitorship Estate. (*Id.* ¶ 21). McNamara brings the following causes of action against Defendants: (1) fraudulent transfer; (2) restitution/unjust enrichment; and (3) equitable accounting. (*Id.* ¶¶ 103–121). Defendants now move to dismiss, contending, *inter alia*, that McNamara has exceeded his authority under the Appointment Order by bringing this suit. (*See generally* Defs.' Mot. to Dismiss ("MTD"), ECF No. 29).

## II. LEGAL STANDARD

Dismissal is appropriate under Rule 12(b)(6) where a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as factual allegations are insufficient. *Twombly*, 550 U.S. at 555. Accordingly, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"Generally, a district court may not consider any material beyond the pleadings in a ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). "However, material which is properly submitted as part of the complaint may be considered." *Id.* Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in a Ruling on a Rule 12(b)(6) motion to dismiss. *Branch v.*

*Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). On a motion to dismiss, a court may also take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986). Otherwise, if a court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgment. Fed. R. Civ. P. 12(d).

If the court grants a motion to dismiss for failure to state a claim, leave to amend should be granted unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *DeSoto v. Yellow Freight Syst., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). Pursuant to Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## III. <u>DISCUSSION</u>

Defendants move to dismiss McNamara's Amended Complaint (the "Complaint") on the following grounds: (a) McNamara's suit exceeds the scope of his authority under the Appointment Order; (b) the fraudulent transfer claim fails because the underlying allegations are not pleaded with sufficient particularity; (c) the unjust enrichment claim is not cognizable under these facts and, regardless, is barred by the applicable statute of limitations; and (d) the claim for equitable accounting fails to state a claim. (MTD 4:16–14:14, ECF No. 29).

The Court turns first to the threshold issue of whether the Appointment Order vests McNamara with authority to file this suit.

### A. The Scope of McNamara's Monitorship Authority

According to Defendants, the Appointment Order does not authorize McNamara to bring this action. Defendants contend that McNamara's authority is limited to tracking down assets transferred between 2008 and 2012 because that timespan informed the Court's calculation of

the $1.27 billion judgment in *FTC v. AMG*. (*Id.* 5:15–26). Defendants further argue that because the Complaint alleges that Defendants' receipt of fraudulently transferred assets came from a non-Monitor Entity, specifically C.B. Service Corp., this action does not fall within the scope of the Appointment Order. (*Id.* 6:10–23).

"[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad." *S.E.C. v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986); *S.E.C. v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980) ("[T]he authority derives from the inherent power of a court of equity to fashion effective relief."). "As an officer of the court, the receiver's powers are coextensive with his order of appointment." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) (citing 13 Moore's Federal Practice ¶¶ 66.02–.03 (3d ed. 1999)).

Defendants argue that McNamara's authority is confined to tracking down monies transferred between 2008 and 2012. Defendants reason that the Court, in its summary-judgment order in *FTC v. AMG*, calculated the $1.27 billion judgment based upon "consumer loss between 2008 and 2012." (*Id.* 5:15–26). Therefore, Defendants assert that any assets transferred outside of this four-year time span are beyond McNamara's reach. (*Id.*).[1] This contention, however, misapprehends the distinction between the basis for calculating a judgment and the means by which assets are recovered in aid of executing a judgment. In recovering assets of the Monitorship Estate, McNamara does not represent the defrauded investors whose collective injuries served as the basis for the $1.27 billion judgment. Rather, McNamara stands in the shoes of the Monitor Entities, the assets of which, once located and discovered, will facilitate post-judgment enforcement of this Court's Order by maximizing the value of the Monitorship Estate. This is consistent with the Appointment Order—the source of

---

[1] Insofar as Defendants advance this argument in service of a statute-of-limitations defense, (*see* MTD 6:1–8), the Court addresses this below, *see infra* Sections III.C.1, III.D.

McNamara's authority—which broadly authorizes recovery of Monitorship Estate assets "wherever they may be located, in whosever possession they be found, whether owned directly or indirectly." (Appointment Order §§ VI, VII.R, ECF No. 20-1). In short, nothing in the Appointment Order limits McNamara to clawing back funds transferred between 2008 and 2012.

Defendants also argue that the Court's Appointment Order does not authorize McNamara to file suit on behalf of non-Monitor Entities, such as C.B. Service Corp. (*Id.* 6:10–23). To do so, Defendants continue, McNamara must plead a theory of alter ego, which nevertheless fails because the relationship between Defendants and any applicable Monitor Entity is too attenuated. (*Id.* 6:25–8:27). The Court disagrees.

Contrary to Defendants' suggestion, McNamara is not bringing claims on behalf of C.B. Service Corp. Rather, McNamara brings this action on behalf of NMS and other Monitor Entities, whose assets are alleged to have been coercively transferred to Defendants at Tucker's direction. (Am. Compl. ¶¶ 13, 93). McNamara alleges that "NMS is entitled to and owns the assets of C.B. Service Corp.," which was established as a shell corporation to conceal Tucker's ownership. (*Id.* ¶¶ 66–67). Per the Appointment Order, NMS and its "successors, assigns, affiliates, and subsidiaries," are Monitor Entities. (*See* Appointment Order § VI, Ex. A to Am. Compl., ECF No. 20-1). Assets of the Monitor Entities—"wherever they may be located, in whosever possession they may be found"—belong to the Monitorship Estate. (*Id.*).

For this reason, and contrary to Defendants' suggestion, McNamara need not plead a veil piercing theory to bring this suit into compliance with his authority under the Appointment Order.[2] Indeed, that McNamara may recover Monitorship Estate assets funneled through non-Monitor Entities is expressly contemplated in the Court's Appointment Order. (*See*

---

[2] The Court notes that even if McNamara were required to plead an alter ego theory here, the Complaint is replete with allegations establishing that C.B. Service Corp. is an alter ego of NMS and Tucker. (*See* Am. Compl. ¶¶ 13, 30, 61, 66–70, 79, 82, 84–86).

Appointment Order § VII.G, ECF No. 20-1) (authorizing and directing McNamara to "[c]onduct such investigation and discovery . . . as may be necessary to locate and account for additional Assets (including Assets held by either Persons or entities other than a Defendant) belonging to, or held by others for the benefit of, any Defendant or Monitorship Entity, for inclusion in the Monitorship.").

The Court agrees with McNamara that applicable case law confirms his authority to track down fraudulently transferred funds residing with third parties. The leading case to address this issue, *Scholes v. Lehmann*, 56 F.3d 750, 752 (7th Cir. 1995), provides an illustration of a court-appointed monitor's role with respect to initiating fraudulent transfer actions on behalf of entities previously controlled by a criminal mastermind. In *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008), the Second Circuit summarized *Scholes* as follows:

> In *Scholes*, Michael Douglas created three corporations and caused them, in turn, to create limited partnerships. The corporations were the general partners and sold limited partner interests to investors in a Ponzi scheme. In the civil enforcement action, the district court appointed one receiver to represent both Douglas and the corporations, who then sought to recover assets conveyed to third parties. Those third parties argued that the receiver was suing on behalf of the investors, not Douglas or the corporations, and lacked standing to do so. The Seventh Circuit disagreed, noting that the corporations—"Douglas's robotic tools"—were still distinct legal entities with separate rights and duties. "The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell they became entitled to the return of the moneys . . . that Douglas had made the corporations divert to unauthorized purposes."
>
> Once the "zombie" corporations were under the control of the receiver, the receiver's only object was "to maximize the value of the corporations for the benefit of their investors and any creditors." The receiver pressed a claim that the corporations had a right to a return of their assets that had been distributed by Douglas in his scheme. Because Douglas controlled the corporations completely, the transfers were, in essence, coerced.

*Id.* at 132 (footnote omitted) (citations omitted). Such is the case here. The entities formerly under Tucker's control, having now been "freed from his spell," are entitled to return of monies Tucker fraudulently—and coercively—diverted. *Scholes*, 56 F.3d at 754. McNamara, as Monitor on behalf of the Monitorship Estate, has been granted authority to discover concealed assets and file suit to secure their return, as stated in the Appointment Order. And because McNamara's claims are those that could have been brought by the formerly coerced Monitorship Entities themselves, McNamara is well within his mandate. *See Eberhard*, 530 F.3d at 132 ("A receiver may commence lawsuits, but 'stands in the shoes of the corporation and can assert only those claims which the corporation could have asserted.'") (citation omitted); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013) ("[T]he corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted to third parties without receiving reasonably equivalent value."). Accordingly, Defendants' argument fails.

**B. Choice of Law**

The parties dispute whether Nevada law or Kansas law governs McNamara's claims. (*See* MTD 9:2–12): (Pl.'s Resp. to MTD ("Resp.") 19:20–24:5, ECF No. 33). "Federal courts sitting in diversity must apply 'the forum state's choice of law rules to determine the controlling substantive law.'" *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005) (quoting *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002)). As a general matter, the Nevada Supreme Court has endorsed looking to the Second Restatement of Conflict of Laws and applying the most specific, applicable section to questions of tort and contract law. *See Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cty. of Clark*, 134 P.3d 111, 116 (Nev. 2006) ("[T]]he Second Restatement's most significant relationship test governs choice-of-law issues in tort actions unless another, more specific section of the Second Restatement applies to the particular tort."); *see also Pacific W. Bank v. Eighth Judicial Dist. Ct. of State in and for Cty. of*

*Clark*, 383 P.3d 252, 254–55 (Nev. 2016).

In light of this authority, this Court will look to § 148 of Restatement (Second) of Conflict of Laws, concerning fraud and misrepresentation, and § 221 dealing with unjust enrichment. Both sections state that the factors identified therein control "unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6." *See* Restatement (Second) of Conflict of Laws §§ 148(1), 221. Because McNamara's allegations in the Complaint—including the evidence he attaches and incorporates by reference therein—indicate Kansas is the forum state with the most meaningful connection to the occurrences giving rise to the claims in this action, the Court looks to § 6 for guidance. *See Gen. Motors Corp.*, 134 P.3d at 117 ("[I]n order for the analysis to move past this general rule and into the section 6 principles, a party must present some evidence of a relationship between the nonforum state, the occurrence giving rise to the claims for relief, and the parties.").

Under § 6 of the Restatement, the following choice-of-law principles guide the Court's analysis: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. Restatement (Second) of Conflict of Laws § 6(2). "These principles are not intended to be exclusive and no one principle is weighed more heavily than another." *Gen. Motors Corp.*, 134 P.3d 111 at 117 (citing Restatement (Second) of Conflict of Laws § 6 cmt. c).

Upon weighing these choice-of-law principles, the Court is satisfied that Kansas has the most significant relationship to this matter. McNamara alleges, and Defendants do not dispute, that Tucker's underlying payday lending scheme—based upon which McNamara seeks to claw

back fraudulently transferred assets—was based in Kansas at all relevant times. (*See, e.g.*, Am. Compl. ¶ 44) ("From 1997 through at least 2013, Tucker founded, controlled, and dominated a web of criminal payday lending companies based in Kansas."); (*see also id.* ¶ 48) ("Tucker managed, owned, operated, controlled, and dominated the tribal lenders, the service companies and the corporate lenders and the other Monitor Entities from his based of operations in Overland Park, Kansas, where at one point in excess of 600 employees worked."). Nevada, on the other hand, is not alleged to have any significance to any substantive allegation in the Complaint. This suggests to the Court that Nevada's public policy interest, to the extent implicated in this case, is relatively insignificant in comparison to that of Kansas. Indeed, Kansas's policy interests, in terms of protecting its citizenry from fraudulent financial schemes, weighs strongly on the balance. As McNamara points out, Kansas has promoted its policy by adopting doctrines such as the adverse-domination rule, which encourage suits like the present one by tolling an applicable limitations period until the wrongdoer is expelled. (Resp. 21:11–18) (citing *Resolution Tr. Corp. v. Scaletty*, 891 P.2d 1110, 1116 (Kan. 1995)).

As for the protection of justified expectations, Kansas, as well as the parties to this suit, would be justified in anticipating application of Kansas law given that Tucker's payday lending enterprise was operated out of that state. *See Finnerty v. Howmedica Osteonics Corp.*, No. 2:14-cv-00114-GMN-GWF, 2016 WL 4744130, at *4 (D. Nev. Sept. 12, 2016) (noting that "entities conducting business in [a state] have a justified expectation they will be held accountable under [that state's laws]."). Similarly, considerations of certainty, predictability, and uniformity of results support applying Kansas law. *See id.* ("When the conduct and injury occur in one state, common sense dictates that applying that state's law provides certainty, predictability, and uniformity to future incidents whose conduct and injury occur in the same state."). Application of Nevada law, in contrast, would disserve the parties' justified expectations. Again, none of the substantive facts in the Complaint concern any Nevada-based

transactions or Nevada residents.

As to the remaining factors, the Court finds them inapplicable or otherwise neutral as to the determination of the forum state with the most significant relationship to this case. In light of Kansas's link to the fraudulent scheme underpinning this case—and the corresponding absence of any substantive Nevada-based connection—the Court will apply Kansas law.

**C. Fraudulent Transfer**

Defendants move to dismiss the fraudulent transfer claim on the grounds of timeliness and lack of factual particularity. The Court address each argument in turn.

*1) Statute of Limitations*

Defendants suggest that the four-year limitations period governing fraudulent transfer claims limits McNamara's ability to reach the assets at issue in this case. (MTD 6:1–8). McNamara disagrees, asserting that Kansas employs doctrines such as the discovery rule and adverse domination to fraudulent transfer claims. (Resp. 13:25–27). Under these doctrines, McNamara states the limitations period could not have been triggered until after his discovery of these fraudulent transfers in his capacity as Monitor. (*Id.* 14:1–9).

Under Kansas law, fraudulent transfer claims are generally subject to a four-year statute of limitations. *See* K.S.A. 33-209. That statute also includes an iteration of the discovery rule, pursuant to which claims accrue either when the transfer was made, or "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." *Id.*; *see, e.g.*, *Estate of Draper v. Bank of Am., N.A.*, 205 P.3d 698, 714 (Kan. 2009) ("[W]e agree . . . that this action did not accrue until the earliest time the plaintiff had a right to maintain a legal action.").

Here, the fraudulent transfer claim is timely under this statute's discovery rule. McNamara could not have brought this action prior to November 30, 2016, when this Court issued the Appointment Order. That order supplies McNamara's legal authority to sue on

behalf of the Monitorship Estate and investigate the location of its assets. Therefore, because McNamara filed this action within a year of his appointment, Kansas's discovery rule applies and renders the fraudulent transfer claim timely. *See Estate of Draper*, 205 P.3d at 715.

### 2) *Sufficiency of Fraud-based Allegations*

Defendants argue that McNamara's fraudulent transfer claim fails for want of factual particularity under the heightened pleading standard of Rule 9(b). (MTD 9:1–12:10). McNamara responds that a relaxed pleading standard applies because, as Monitor, he is a third party suing on behalf of coerced companies and cannot be expected to have all relevant facts at his disposal. (Resp. 5:10–11) (citing *Smith v. Arthur Andersen L.L.P.*, 175 F. Supp. 2d 1180, 1201 (D. Ariz. 2001)). Nevertheless, McNamara continues, the Complaint pleads enough factual material to put Defendants on notice of the conduct alleged, and to comply with Rule 9(b). (*Id.* 7:5–7).

Under Rule 9(b), a party's allegations of fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Under this standard, a complaint alleging fraud or mistake must include allegations of the "time, place, and specific content of the false representations" as well as the identities of the parties involved. *See Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). However, "Rule 9(b) may be relaxed to permit discovery in a limited class of corporate fraud cases where the evidence of fraud is within a defendant's exclusive possession." *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001) (citing *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) ("Such 'an exception exists where, as in cases of corporate fraud, the plaintiffs cannot be expected to have personal knowledge of the facts constituting the wrongdoing.'") (citation omitted); *see, e.g.*, *FTC v. AMG Servs.*, No. 2:12-cv-00536-GMN-VCF, 2012 WL 6800778, at *5 (D. Nev. Dec. 28, 2012) (applying a relaxed 9(b) standard "because the FTC is reasonably unable, at this stage of the litigation, to identify the specific actions that each

Defendant took in furtherance of the corporate fraud scheme that caused the alleged harm."). "In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts on which the belief is founded." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (quoting *Wool*, 818 F.2d at 1439); *see also Smith*, 175 F. Supp. 2d at 1201 ("[L]ess particularity is required where plaintiff is not asserting that the fraud was against himself personally, but rather it was committed against a third party.").

The Court concludes that whether or not Rule 9(b)'s heightened pleading standard controls here, McNamara has sufficiently alleged the elements of fraudulent transfer. Under Kansas law, "[a] fraudulent transfer occurs when a debtor intends to hinder, delay, or defraud a creditor, or transfers property under certain conditions to another person without receiving reasonably equivalent value in return." *McCain Foods USA, Inc. v. Cent. Processors, Inc.*, 61 P.3d 68, 75 (Kan. 2002). McNamara alleges that in July 2002, Defendants—at the insistence of Hallinan, Tucker's co-conspirator—made a $500,000 loan to C.B. Service Corp with the intention of depriving C.B. Service Corp. and NMS of assets. (Am. Compl. ¶¶ 87–88). Tucker subsequently directed C.B. Service Corp. to pay $630,000 over the course of five years disguised as "interest payments." (*Id.* ¶ 96). In support, McNamara attaches an exhibit identifying the specific dates of these "interest payments," and the specific sums transferred. (*Id.*) (citing Summary of Payments, Ex. C to Am. Compl., ECF No. 20-1). McNamara need not allege more to put Defendants on notice of precisely the conduct he claims is fraudulent. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) ("[A] complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify the 'precise method' used to carry out the fraud." (quoting *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)); *see also* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1298 (3d ed. 2016) ("Perhaps the most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for

purposes of Rule 9(b) is the determination of how much detail is necessary to give adequate notice to an adverse party and to enable that party to prepare a responsive pleading.").

With respect to the "intent to hinder, delay or defraud anyone," Defendants contend that McNamara's allegations are insufficient to support an inference of intentional fraud. (MTD 10:1–3, 10:14–11:11). On this point, McNamara argues that the Complaint adequately identifies "badges of fraud," which are collectively enough to satisfy intent. (Resp. 6:2–7:13).

Under Kansas law, because actual intent is "rarely subject to proof by direct evidence," courts "are directed to look for the occurrence of one or more attributes of fraudulent transfers, referred to colloquially as 'badges of fraud.'" *In re Shore*, 305 B.R. 559, 566 (Bankr. D. Kan.), *aff'd*, 317 B.R. 536 (B.A.P. 10th Cir. 2004) (citation omitted); *see also* K.S.A. 33-204(b) (identifying eleven non-exhaustive factors to consider in determining "actual intent").

McNamara focuses upon three badges of fraud under Kansas's fraudulent transfer statute: (i) the transfer or obligation was to an insider; (ii) the debtor removed or concealed assets; and (iii) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. (Resp. 6:2–9) (citing K.S.A. 33-204(b)). McNamara alleges that Defendants, the daughters of Tucker's co-conspirator, are insiders who received $630,000 disguised as "loan interest payments," from 2003 to 2008 on a $500,000 loan. (Am. Compl. ¶¶ 13, 16). The underlying loan, allegedly at an above-market interest rate of 24 percent per annum, was solely to benefit Defendants and did not arise from an arms-length transaction. (*Id.* ¶ 16). As to the concealment of assets, McNamara alleges that the $500,000 loan was intended to deprive NMS of its assets by diverting money to Defendants through sham entities such as C.B. Service Corp. (*Id.* ¶ 15). According to McNamara, these transfers coincided with the initiation of multiple lawsuits and regulatory investigations, suggesting a deliberate attempt to conceal the existence of these assets. (*Id.* ¶ 94). With respect to the value of consideration received by the debtor, the

Complaint states that between January and August of 2005, the interest payments ceased without explanation and then resumed in September 2005. (*Id.* ¶ 97). McNamara further claims NMS did not receive any equivalent value for the loan, as evidenced by the loan's exorbitant interest rate, NMS not paying off the loan despite the high interest rate, and NMS having more than ample funds to do so. (*Id.* ¶¶ 90–99).

The Court finds these badges of fraud, in conjunction with the Complaint's specific allegations detailing the payments Defendants received from C.B. Service Corp., are sufficient to state a claim for fraudulent transfer. As such, the Court denies Defendants' Motion to Dismiss as to this claim.

**D. Unjust Enrichment**

Defendants raise a statute of limitations defense, contending that the unjust enrichment claim is time-barred because McNamara did not bring this action within three years of the most recent alleged transfer of assets, taking place in 2008. (MTD 13:13–22).

Unjust enrichment claims in Kansas are generally subject to the three-year limitations period under K.S.A. 60-512. *See Estate of Draper*, 205 P.3d at 715; *Stehlik v. Weaver*, 482 P.2d 21, 27 (Kan. 1971). "The statute of limitations for an unjust enrichment claim begins to run when all of the elements of unjust enrichment are present." *Walsh v. Weber*, 379 P.3d 1150 (Kan. Ct. App. 2016) ("This generally means that the statute of limitations begins to run the moment the retention of property becomes unjust.") (citing *Estate of Draper*, 205 P.3d at 715).

McNamara argues that the claim is timely because Kansas endorses the doctrines of equitable tolling and adverse domination, both of which render the claim timely. (Resp. 17:26–18:6). The authorities McNamara cites in support, however, do not support this proposition. *See Stark v. Mercantile Bank, N.A.*, 33 P.3d 609, 611 (Kan. Ct. App. 2000); *Catron v. Colt Energy, Inc.*, No. 13-4073-CM, 2014 WL 7246804, at *5 (D. Kan. Dec. 17, 2014). On the contrary, Kansas appears to foreclose application of the discovery rule, as well as other

equitable doctrines such as adverse domination, to claims not sounding in intentional fraud, such as unjust enrichment. *See Kelly v. Primeline Advisory, Inc.*, 889 P.2d 130, 135 (Kan. 1995) ("Because of the general nature and potential applicability of 60–512(2) to many different kinds of actions, the statute is not a comfortable location for a sweeping 'one size fits all' discovery rule."); *Doll v. Chicago Title Ins. Co.*, 517 F. Supp. 2d 1273, 1282 (D. Kan. 2007) (declining to apply discovery rule to unjust enrichment given the "absence of any Kansas authority" in support); *see also Great Plains Tr. Co. v. Union Pac. R. Co.*, 492 F.3d 986, 995–97 & 996 n.2 (8th Cir. 2007) (applying Kansas law and concluding that the discovery rule tolls the limitations period for fraudulent transfer but not non-fraud claims, including unjust enrichment); *Estate of Draper*, 205 P.3d at 715 (citing *Great Plains* with approval in the context of determining when unjust enrichment claims accrue). This is consistent with Kansas's statutory scheme governing limitations periods. Unlike the statutory provisions governing fraudulent concealment and fraud, K.S.A. 60-512 does not contain a discovery rule. *Perry H. Bacon Tr. v. Transition Partners, Ltd.*, 298 F. Supp. 2d 1182, 1189 (D. Kan. 2004); *see also Scaletty*, 891 P.2d at 1115 (premising adoption of the adverse domination rule on the language of K.S.A. 60-513, which provides that a fraud-based claim accrues upon its discovery).

In the absence of any controlling authority demonstrating Kansas courts toll unjust enrichment claims until they are discovered, the Court is left with the three-year limitations period under KSA 60-513 and the general rule that such claims accrue once all elements are present. *See Estate of Draper*, 205 P.3d at 715. Consequently, the Court agrees with Defendants that because the most recent fraudulent transfer in this case happened in 2012, McNamara's unjust enrichment claim, filed in 2017, is time-barred.

### E. Equitable Accounting

Defendants argue that dismissal is warranted as to McNamara's equitable accounting

claim because such a claim requires the existence of a fiduciary relationship, which Defendants contend is missing here. (MTD 13:28–14:7). According to Defendants, because the Complaint is silent as to any duty giving rise to a right to an accounting, this claim cannot survive the present Motion. (*Id.* 14:6–14).

In response, McNamara contends that the existence of a fiduciary duty is not necessary to assert an equitable accounting claim. (Resp. 19:2–4). Rather, McNamara continues, Kansas law only requires the existence of an account of such complexity that a court, rather than a jury, is best suited to comprehend it. (*Id.* 19:4–10). Consequently, McNamara argues that dismissal would be premature because at this stage, the necessity of equitable accounting is presently unclear. (*Id.* 19:10–18).

The Court declines to dismiss the prayer for equitable accounting. Kansas law treats equitable accounting as a remedy attendant to a claim rather than a stand-alone cause of action. *See, e.g.*, *Smith v. Amoco Prod. Co.*, 31 P.3d 255, 258 (Kan. 2001) ("This equitable action for an accounting is based on alleged breaches of the implied covenant to market and the implied duty of good faith and fair dealing . . . ."); *Goffe & Clarkener v. Lyons Milling Co.*, 26 F.2d 801, 804 (D. Kan. 1928), *aff'd sub nom. Lyons Milling Co. v. Goffe & Carkener*, 46 F.2d 241 (10th Cir. 1931); *see also Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 965 (10th Cir. 2009) (characterizing equitable accounting as appropriate only in a "'rare case' when computational complexities will render a legal remedy inadequate.") (quoting *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962)).

As such, the Court finds that dismissal is premature at this stage and therefore unwarranted. *See Jordan v. Unified Gov't of Wyandotte Cty.*, 100 F. Supp. 3d 1111, 1120 (D. Kan. 2015) (declining to decide at the motion-to-dismiss stage whether the plaintiffs "are able to pursue this remedy and, if so, whether they can obtain that remedy from any of the defendants in this case."); *Strategic Energy Income Fund III, L.P. v. Stephens Energy Grp.,*

*LLC*, No. 6:16-cv-01033-JTM, 2016 WL 4399221, at *10 (D. Kan. Aug. 18, 2016) (same).

In summary, McNamara has sufficiently pleaded a plausible basis for his authority to bring this fraudulent transfer suit. Defendants' Motion to Dismiss, as to fraudulent transfer and equitable accounting, is therefore denied. With respect to unjust enrichment, this claim is time-barred under Kansas law and is therefore dismissed with prejudice. The Court grants Defendants' Motion as to this claim.

### F.  Defendants' Motion to Stay

On August 9, 2019, Defendants filed a Motion to Stay, (ECF No. 98), pending the Court's ruling on Defendants' Motion to Dismiss, (ECF No. 29). Because the instant Order provides Defendants with a ruling, it therefore eliminates the need for the requested relief. Accordingly, Defendants' Motion to Stay, (ECF No. 98), is **DENIED as moot**.

## IV.  CONCLUSION

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, (ECF No. 29), is **GRANTED in part** and **DENIED in part**. The Motion is **DENIED** as to McNamara's claims for fraudulent transfer and equitable accounting, and is **GRANTED** as to unjust enrichment.

**IT IS FURTHER ORDERED** that McNamara's unjust enrichment claim is **DISMISSED with prejudice**. The claim for fraudulent transfer and the requested remedy of equitable accounting survive.

**IT IS FURTHER ORDERED** that Defendants' Motion to Stay Proceedings, (ECF No. 98), is **DENIED as moot**.

**DATED** this __28__ day of September, 2019.

_____
Gloria M. Navarro, District Judge
United States District Court